UNITED STATES v. WEBER. See Cases Nos. 17,327–17,329.

## Case No. 16,658.

### UNITED STATES v. WEBSTER.

[2 Ware (Dav. 38) 46.] [1]

District Court, D. Maine. June Term, 1840. [2]

ARMY QUARTERMASTER—DUTIES AND AUTHORITY—SETTLEMENT OF CLAIMS—SEMINOLE WAR—COMMISSIONS ON DISBURSEMENTS — INTERPRETATION OF STATUTES—PREAMBLE.

1. The duty of a quartermaster is to provide supplies and necessaries for the army. Under the general laws relating to the service and the army regulations, his authority is restricted to furnishing supplies of a particular description, and if he furnishes other articles than such as are allowed by law and usage, he cannot charge the United States with them.

2. The laws and usages of the service restrict him as to the nature of the claims against the United States, arising out of the service, which he may settle and allow, and if he settles and pays such as he is not authorized to pay, such payment will not be a legal set-off in an action by the United States against him.

3. It is the duty of the quartermaster to provide quarters, hospitals, provisions, etc., for the army, and when obtained by contract he may pay for them. But when taken by impressment, whether he is authorized to settle and pay for them, by law and the common usage of the army—quære.

[1] [Reported by Edward H. Daveis, Esq.]
[2] [Affirmed by circuit court. Case unreported.]

4. But such claims against the United States, arising during the Florida war, he had authority to adjust and settle by the act of May 28, 1836, c. 82 [5 Stat. 33].

5. The preamble of a statute cannot control the enacting part of the law when the meaning is clear; but when the language is ambiguous and may admit a larger or more restricted interpretation, the preamble may be referred to, to determine which sense was intended by the legislature.

6. The reason of this rule of interpretation is, that it states the reasons and objects of the law.

7. If the reasons and objects of the law are made known by any other document equally authentic and certain, these may for the same reason be referred to, to aid in the interpretation of doubtful or ambiguous language in the law.

8. The intention of the act of May 28, 1836, was, to authorize the quartermaster to adjust and pay such claims, against the United States, as he was not authorized to settle and pay under the general laws and usages of the service.

9. Under this act, the quartermaster was authorized to settle and pay for articles taken for the use of the United States, with the consent of the owners, without contract, or impressed; whether such as are consumable, as provisions; or not, as horses, carriages, arms, etc., and are lost by the accidents of the war. The common principle of the law of letting and hiring, by which, in a loan for use, the lender runs the risk of loss by extraordinary accidents, does not apply to such a case.

10. But the law did not authorize him to pay for special damage to a house and grounds, occupied for quarters for the officers and for an encampment.

11. Under the order of the war department of May 18, 1833, repeated in that of 1835, and making the 56th article in the Digest of December, 1836, the defendant is not entitled to charge commissions on his disbursements.

This was a suit brought by the United States against Captain Webster, a disbursing officer in the quartermaster's department of the army, to recover a balance of money alleged to be remaining in his hands, and for which he had not accounted. The jury to whom the case was submitted returned a special verdict, stating the general balance claimed, viz., $8,481.47, and enumerating the particular credits claimed by the defendant, and referring to the decision of the court, as matter of law, whether he was entitled to the credits which he claimed, or any part of them. The facts found by the verdict are, that the defendant was duly appointed an acting assistant quartermaster of the left wing of the army, in active service in the war against the Seminole Indians, on the 15th of February, 1836, and continued to act as such till March 1, 1837, during which period the disbursements were made; that in that time he received the sum of $143,595.04; that during the whole time he held the commission of a first lieutenant in the line of the army, and received the pay and emoluments attached to that office, and no other; that he claimed the commission of 2½ per cent for disbursing part of said sum, amounting to $2,652.46, which was disallowed by the accounting officer of the treasury department, and that this per-

centage, if by law any may be allowed, is a reasonable compensation for said service, and ought to be deducted from the balance claimed to be due. The jury also found, that the disbursements were made for expenses incurred and supplies furnished, on account of the militia received into the service of the United States in Florida, prior to the 28th of May, 1836. And they further found, that of the moneys then received and disbursed by the defendant, he paid,—First, for property impressed into the service of the United States and lost in their service, $325. Secondly, for property not purchased, but received into the service of the United States for their use, with the consent of the owners, viz.: horses and vehicles for transportation, and horses and military equipments, used by the militia in said service, and lost and destroyed, the sum of $5,144.15. Thirdly, for special damages done to a house occupied as quarters, and to ground occupied as an encampment, in said service, $130. Fourthly, for articles purchased and used in the service, $300.40. All these credits had been presented to the accounting department of the government, and disallowed; and are to be allowed to the defendant in offset, all, if, in the opinion of the court, they were paid and disbursed agreeably to law. And if, in the opinion of the court, the defendant is, by law, entitled to all the credits he has claimed, including the percentage, then the jury find that the defendant never promised; and if, in the opinion of the court, the defendant is not entitled to the whole, but is entitled to any part of said credits, then such part as he is by law entitled to, is to be deducted from the said sum of $8,481.47, and the jury find that he did promise for the residue.

Mr. Howard, Dist. Atty., for the United States.

Mr. Hobbs, for defendant.

WARE, District Judge. The question which the jury, by their verdict, have referred to the opinion of the court, is, whether the defendant is by law entitled to all or any part of the credits which he claims. If he is, they find that to that extent they are to be allowed and deducted, as offsets from the general balance demanded by the plaintiffs. So far as these consist of charges for disbursements, it was not denied at the hearing that they were actually made by him, under color of his authority as an acting quartermaster, and that the articles paid for were actually received and consumed by the troops or lost. The ground on which the allowance of them is contested is, that the disbursements were made in satisfaction of claims against the United States, which, however just and valid they may be, he, in his quality of acting quartermaster, was not authorized to settle and pay.

1. The jury have distributed these credits into four classes, distinguished from each

other by the different circumstances, under which the several claims against the United States originated. The first class is constituted of articles impressed and lost in the public service. It is not denied, as it cannot be, that the owners are justly entitled to a compensation for their property thus taken without their consent, and appropriated to the public use; but it is said that it does not fall within the ordinary duty of the quartermaster's department, to adjust and settle claims of this description; these claims having, as it is contended, always been settled by a different tribunal. It is the peculiar and appropriate duty of the quartermaster's department, to provide for the troops such supplies and necessaries, and to procure such services to be performed, as the exigencies of the public service require for the subsistence, the comfort, and the efficient action of the army, whether in movement or position. But the general laws, the army regulations, and the ordinary usages of the service, restrict the quartermaster, in furnishing these supplies, to articles of particular descriptions. He has not an unlimited authority to furnish the troops, at his discretion, with any articles, which, in his judgment, may be necessary or convenient for them, or conducive to their health or comfort. If, therefore, he purchases for their use articles which are not authorized by the regulations and usages of the service, he cannot charge them to the United States. Being an agent acting under a limited authority, he cannot charge his principal, when he exceeds his authority. The same regulations and usages may undoubtedly restrict the quartermaster, as to the nature of the claims which he is allowed to adjust and settle, although they may be immediately connected with the subsistence and operations of the army, and indispensable to the service; and if he undertakes to pay such claims, he cannot, by the accounting officer, be credited for such payments, and it may at least be questionable whether they can be allowed by the court, as a legal or equitable set-off, in an action against him for a balance unaccounted for. Such a payment may constitute a just claim against the United States, and he may be equitably subrogated to the rights of the creditor whose demand he has satisfied, but he will be turned over to the same remedies, for obtaining his remuneration, which would be open to the original creditor.

If these accounts of Captain Webster were to be settled and adjusted under the general laws, providing for this branch of the public service, and the regulations and established usages, which constitute the complement of the law, it would be desirable to have some more satisfactory evidence of what those usages are. No part of the army rules and regulations, which has been quoted at the bar, speaks at all of the forcible impressment of articles for the public service, nor, of course, of the mode of settling and paying for them. They neither affirm nor deny the authority of the quartermaster in this particular. I am not aware that, from the silence of the regulations, any argument can be drawn either in favor or against his authority. It is made the duty of the quartermaster, to provide quarters, hospitals, provisions, fuel, forage, means of transportation, and other necessaries of the service. Ordinarily, they will be obtained by contract; but if they cannot be so obtained, the necessity of the case, and the usages of war, authorize the taking them by force. But as private property cannot be taken for the public use, without a just compensation (Const. Amend. U. S. art. 5), the authority of an officer to take, would seem to involve that of paying the fair value when taken. But it is said, that though the officer has the right, in a case of necessity, to take by impressment, his authority to pay the price of what he has taken, is negatived by the established and uniform usage of the service. A number of acts of congress were referred to, providing specially for the payment of impressed property, and they have been insisted upon as proving, that it has been the invariable practice of the government to provide for the settlement of such claims by special laws. Now these laws prove affirmatively, that such claims have in many cases been provided for, by special laws; but they do not prove negatively, that no claims of this description may be, or ever have been settled, and adjusted, under the general laws and usages applicable to this branch of the public service. The acts referred to were not laws providing for the current expenses of the army, but for the settlement of old claims, which may have been omitted to be adjusted and paid at the times, from other causes than the incompetency of the quartermaster to settle them. But in point of fact, the decision, of this part of the case, does not turn principally on the general laws, providing for the military service, nor upon the common and ordinary usages of the army. All the payments of Captain Webster, which are now in controversy, were made under the authority of an act, specially providing for the expenses of the Florida war. This act provides, "That the secretary of war be, and he hereby is, directed to cause to be paid the expenses that have been incurred, and the supplies which have been furnished, in the states of South Carolina, Georgia, Alabama, Louisiana, and the territory of Florida, on account of the militia and volunteers received into the service of the United States, in defence of Florida; provided, that the accounts, for these claims, shall be examined and audited at the treasury, as in other cases." Act May 28, 1836, c. 82, § 1. The question therefore is, whether Capt. Webster was authorized, as an acting quartermaster, to settle and pay the claims, which form the subject-matter of this controversy, under this law. The law provides for the payment of expenses incurred and supplies furnished. These are terms of very general import, and there is nothing in the language of the act limiting them to ex-

penses and supplies of any particular description; nor is there anything, which authorizes us to give them a more extensive operation, than they have in the general laws, relating to the same subject, that is, to the military service. Looking at the words of the act alone, therefore, it is difficult to derive from them an authority for the payment of any other claims, than such as the quartermaster is authorized to settle, by the general laws and military usage. But there is a paper, among the public documents of that session of congress, which may, like the preamble of a statute, serve to fix and give a more precise and definite meaning to these general terms, by showing the cause and purposes for which the act was passed. Executive Documents (1st Sess. 24th Cong.) Doc. 231. It is a paper which was prepared by the war department, submitted to the house of representatives, and by their order printed before the passage of the law. It contains an abstract of the various claims, which were, or would be, preferred against the United States, growing out of the Florida war, for the payment of which there was no authority under the existing laws, and which must therefore be ultimately rejected, unless provision were made for their settlement by a special act.

It is a rule in the construction of a statute, that recourse may be had to the preamble, though it is in strictness no part of the law, as one element for opening and expounding the meaning and intention of the legislature, although it cannot control the enacting part of the law, when the words are clear and explicit, and are manifestly more comprehensive than the preamble. Perkins v. Sewell, 1 W. Bl. 654; Pattison v. Bankes, Cowp. 543. But when the words of the enacting part are ambiguous, or may fairly admit a larger or more restricted signification, then reference may be made to the preamble, to determine which sense is intended by the legislature. The reason is, that the preamble states the grounds and objects of the law. And when the reasons and grounds of the law are made known, in any other manner equally certain and authentic, they are entitled to have the same influence, in the construction of a statute, as the preamble, if the meaning of the words is doubtful, because every law ought to be carried into effect according to the intention of the law-maker, when the intention can be certainly known. Com. Dig. "Parliament," R. 11. It appears to me that a document, prepared and published as this was, and preserved among the public archives of the country, stating the nature of the claims to be provided for, and the necessity of a special act for that purpose, and which was before the legislature, at the time when the law was passed, may be fairly invoked in aid of the exposition of the statute; not to control the meaning of the legislature clearly and explicitly expressed, but to give a precise and determinate meaning to words which are ambiguous, or expressions which may be taken with a greater or less latitude of signification. If it does not bring before the court the objects and intentions of the law-maker, in so solemn and authentic a form as when these intentions are set forth in a preamble, at least it affords a medium of exegesis, against which the court cannot shut its eyes, without excluding, from its consideration, what would have an influence upon every mind studious of ascertaining the real intent of the law-maker. It appears from this paper, on the sudden breaking out of the war in Florida, the promiscuous massacre of the people, and the wasting of the country by a savage foe, that the militia and volunteers, of the territory and of the neighboring states, turned out with great promptness and alacrity, for the defense of the distressed inhabitants. In this hasty and tumultuary assembling of the military force, there were, as might be expected, great irregularities committed, and a variety of expenses incurred, some from necessity and some through ignorance, which are not authorized in the regular and ordinary course of the military service. The troops were collected, or rather assembled, with strong hands and willing hearts, overflowing with zeal and patriotism, but with little knowledge or familiarity with the details of military duty, and without military arms and accoutrements, provisions, or necessary camp equipage; and these appear to have been taken with great promptitude, and little ceremony, wherever they could be found. "Furor arma ministrat." In the state of South Carolina, it is stated in a letter from the governor to the secretary of war, that horses were impressed and appraised, by warrants from the colonels of regiments, under the belief that they would be paid for, at that valuation. The remark of the war department is, that there is no law which authorizes the payment for horses under such circumstances. A letter of Col. Gadson, quartermaster-general of Florida, states that volunteers are rushing in from all quarters, and making or converting every private storehouse into a public depository, from which is taken anything that may be wanted, upon the simple receipts of even unauthorized agents. Volunteers, he says, were considered as entitled to anything they wanted, and, from private storehouses, the drafts have been large for blankets and a variety of articles not issued under the regulations. Property was seized and appropriated to the public use, with a degree of irregularity and illegality rarely witnessed. It is hard, he adds, that those who yielded to the press should not be indemnified, and he proposes that all these claims should be settled on principles of equity. The war department, upon this, remarks that there is no law which authorizes the payment of claims on equitable principles merely, or which, if paid, would release the disbursing or paying officers, from the operation of the laws and rules of the treasury, on the settlement of their accounts. There appears to be no remedy but legislation. All this irregularity is not a matter

which should occasion surprise. It is what might, under the peculiar and distressing circumstances of the case, naturally be expected. The unprotected inhabitants, after a long period of peace and tranquillity, were aroused from their dreams of security by the sudden onslaught of a barbarous and merciless foe. "Dimicandum est pro aris et focis." They were girding themselves for battle, in defense of their altars and houses, of their wives and children.

It was upon statements like these, that the law of 1836 was made, providing specially for the payment of the expenses incurred and the supplies furnished. If the expenses had been such as the disbursing officers were authorized to pay, under the existing laws and ordinary usages of the army, no special act would have been required. It was because they were not of this character, that a special act was necessary to provide for them, and the natural presumption is, that it was intended to meet all the cases described in the abstract, provided they come within the words of the law in their natural and ordinary signification. It appears to me that it is not straining the meaning of language to hold, that the payment for articles thus irregularly taken and appropriated to the public use, is included in the term, expenses incurred. It is certain that somebody must be liable for them, and against whom can they equitably be charged, unless against the party for whose benefit they were taken and to whose use they were applied? Now among the expenses particularly described, and which the disbursing officers were not authorized to pay, were articles irregularly impressed and appropriated to the use of the army. It appears to me that the natural and just conclusion is, that one of the objects of the law was, to supply that authority. My opinion, therefore, is, that the defendant is entitled to the credits claimed under this part of the finding of the jury.

2. The second class of credits claimed, as they are arranged by the verdict, consists of payments, for articles received into the service of the United States, with the consent of the owners, and lost or destroyed while in their service. It appears, from the vouchers, that some of the articles included in this class, were such as are consumed by use, as provisions for the troops and forage for horses. If we may recur to the abstract which has been mentioned, to aid us in interpreting the law, there does not appear to me to be any substantial reason for doubting whether such expenses were or were not intended to be provided for by the act, and of course whether Capt. Webster had authority to settle and pay them, provided the articles were in fact consumed by the army, although they may have been irregularly taken. If goods, which are consumed by use, are loaned in this way, the contract by which they are transferred is what is technically called "mutuum," or a loan for consumption. It is of the essence of this contract, that the right of property, in the thing loaned, shall pass from the lender to the borrower, and he, by receiving it, becomes bound to return, not the same individual thing, but one of the same species, equal in amount and quality, or if he fails to do so, to pay its value. Pothier, Pret de Consomption, No. 4, 13, 39. The proprietary interest in the thing being transferred to the borrower, if it is lost, or destroyed, the loss falls on him. "Res perit domino." With respect to other articles, as horses and wagons for transportation, and horses and military equipments for the use of the soldiers, there is, at the first view, upon the general principles of the law, more room for doubt. If they were received into the service without being purchased, and with the consent of the owners, it must have been either by a gratuitous loan, or by a contract of hiring. In either case, the limitation of the responsibility of the borrower, or hirer, is well settled, by the general principles of law. He is not liable for a loss occasioned by inevitable accident, or in the language of the common law, by the act of God or the public enemy, unless the loss has been preceded by some fault on his part, without which it would not or might not have happened. Story, Bailm. §§ 240, 408; Pothier, Pret a Usage, No. 55, 56. The jury have not found, by what accidents these losses were occasioned, but by recurring to the vouchers, to which by the agreement reference may be made, it appears that many of them were occasioned majore casu, or by that class of accidents for which the hirer, or borrower, is not ordinarily responsible; and as they were avowedly hired for the use of the army, while actively engaged in war, it cannot be imputed to the plaintiffs as a fault, that they were exposed to destruction by the public enemy. In these cases, the general principles of law place the loss on the owners, and of course the United States would not be liable. If the decision of the present case turned entirely on general principles, the difficulty, which I should feel in this part of it, would be in applying this rule of the common law to a loan made to the public under such circumstances, unless it appeared by the terms of the contract, that the lender expressly took the risks of war upon himself. But waiving this question, by recurring to the abstract, we shall find, that the settlement, for property received into the public service, in this way, and lost, fairly comes within the purview of the act of 1836. In Georgia, for instance, cannon, rifles, muskets, and other articles, were taken from the state arsenal and furnished to the troops, for which somebody must account to the state. The payment, for articles thus taken and lost by the casualties of war, was then one of the claims which were before congress when the law was passed. They were supplies furnished to the militia and volunteers, and, if lost,

the indemnity due to the owners was an expense incurred, which could not be allowed by the accounting officers of the treasury department, under the existing laws; but which, under the pressing exigencies of this case, no one will deny ought to be paid by the United States. It was to meet cases of this kind that the law was made. My opinion therefore is, that these payments are authorized by the law, and that the defendant is entitled to the credits classed under this head.

3. In the third class, are placed special damages done to a house occupied for quarters, and to grounds occupied by the troops for an encampment. No claims of this kind were brought to the view of the legislature, by the document to which reference has so often been made. They are claims which are entirely of a different character from all those enumerated in the abstract, and therefore this document furnishes no reason for supposing that they were within the contemplation of the legislature, when the act was passed. It appears to me, therefore, that the allowance of this credit must be determined by the general laws and usages of the service. It is made the duty of the quartermaster to provide quarters for the army. He must therefore have the authority to agree for the rent and other expenses, necessarily arising out of the execution of his power, and as a disbursing officer, to pay them. This authority seems to be naturally, if not necessarily, incidental to the power of providing quarters, for without it the power cannot be executed. The ordinary deterioration of the property will be taken into consideration, and provided for by the rent. But extraordinary damage, as the destruction of the tenement by fire, or other unusual and unanticipated damages, will not be. The settlement, for damages of this kind, does not appear to me to be necessarily incidental to the general power of providing quarters. A further observation may be made under this head, that the officers in the purchasing department of the army are presumed to be selected with a view to their qualifications for this duty. They may be very competent judges of the value of articles which they are required to purchase, and wholly incompetent to estimate the necessary cost of repairing special damages done to the house, or the injury done to a plantation by cutting down trees, destroying fences, and interrupting the labors of husbandry. My opinion therefore is, that the defendant, in order to entitle himself to these credits, must show, that the settlement of such claims is within the ordinary range of the authority of a quartermaster, under the existing laws, the army regulations, and the established usages of the service; and as no such authority is shown, these credits cannot be allowed.

4. In the fourth class, the jury have placed articles purchased for the army, and consumed or lost in the service. There does not appear to be any objection to the allowance of these credits.

5. The only question arising out of the verdict, which remains to be disposed of, is that of the right of the defendant to charge commissions on his disbursements. The facts found are, that, during the time when he made these disbursements, he was an officer in the line, and that he received only the pay and emoluments attached to his rank as an officer in the line. Whether he performed the duties of quartermaster in addition, or as a substitute, to his other duties, the juries do not find, there having been no evidence upon this point offered on either side.

It is contended that he is not entitled to any such commission, first, because, as an officer under the rules and regulations of the army, by the conditions of his engagement, he was liable to be put upon other duties and services, besides the ordinary duties attached to the office which he held, whenever required by his superiors; and as the occasional performance of extra duties was originally contemplated, under the appointment, no extra compensation for them can, upon general principles, be claimed for such services. There appears to me to be more of logical exactness, than of substantial justice, in this reasoning. It is true that such being the condition attached to the tenure of his office, if extra duties are required, he is bound to perform them, however onerous, or whatever responsibility they may involve. But that in point of equity and good conscience, he can claim no extra compensation for such services, is to my mind by no means so clear. Nor does the law, in other cases, follow out the logical consequences of a contract, with so much rigor, at the expense of general equity and substantial justice. The mate of a vessel, by the very conditions of his engagement, is liable to have devolved upon him the duties and responsibilities of a master. This liability is contemplated in his contract. In case of the master's death, during the voyage, or his being otherwise incapacitated from performing the duties of his office, the mate succeeds, as hæres necessarius, to his employment, with all the duties and responsibilities belonging to it. Yet it has never been doubted, although the possibility of all this is contemplated in his original engagement, that he is entitled to an extra compensation, for these extra services and responsibilities. Now what is just and equitable in the transaction of business between man and man, cannot, one would suppose, be considered inequitable or unreasonable, ordinarily, between an individual and the public. The responsibility of disbursing so large a sum of money, in adjusting and paying a great number of miscellaneous accounts, amidst all the confusion created by a perilous and destructive war, is certainly worth something. But I need not dwell upon this. The present suit

shows, that by mere error of judgment, while acting with the most perfect integrity and best intentions, he might become involved in pecuniary difficulties, extremely embarrassing and even ruinous to his fortunes. My opinion, therefore, would be upon general principles, even unsupported by authorities, that the defendant was entitled to an extra compensation, for the responsibility attendant on this extra duty. And it appears to me that the reasoning of the court in the cases of U. S. v. McDaniel, 7 Pet. [32 U. S.] 1; U. S. v. Fillebrown, Id. 28; and U. S. v. Ripley, Id. 18,—fully authorize this conclusion. But whatever equitable claim the defendant may have, for an extra compensation, on general principles, it is said that every allowance of this kind, whether in the form of extra pay, or commissions for disbursements, is prohibited by the act of March 3, 1835 [4 Stat. 753]. The title of the act is, "Act making additional appropriations for the Delaware breakwater, for certain harbors, and removing obstructions in and at the mouth of certain rivers, for the year 1835," c. 26. At the end of the act there is this proviso: "That no officer of the army shall receive any per cent, or additional pay, extra allowance, or compensation, in any form whatever, on account of his disbursing any public money, appropriated during the present session, for fortifications, executions of surveys, works of internal improvement, building of arsenals, purchase of public supplies of any description, or for any other service or duty whatever, unless authorized by law." It is contended that this proviso is general in its operation and applies to all future appropriations for the military service, as well as to those specially enumerated. Now the first objection that occurs to this interpretation of the law is, that this is not the obvious or natural, nor the grammatical meaning of the words. The proviso is, in its terms, restricted in its operation to the disbursing of moneys appropriated during the then present session of congress. Nor do I see how a more extended sense can be given to the law, consistently with the rules of grammar, without either doing violence to the meaning of the language, or interpolating into the act words not used by the legislature. And this the court has no authority to do when the language has a plain and sensible meaning as it stands. In the second place there is nothing in the character of the act, which would lead one to suppose that the legislature had anything in view beyond the current year. The law is in its nature temporary, making provision for the public service for the current year, and of course spending itself within the year. It is not in such a law that we should naturally be led to look for provisions of a permanent character.

Another objection is made to the allowance of commissions, upon which I have found much more difficulty in arriving at a conclusion satisfactory to my own mind. The general regulations for the army, prescribed by the war department, under the sanction of the president, have been appealed to by both parties as having the force of law. It will not be pretended that these regulations can control or annul an act of the legislature, and when it is said that they have the force of law, nothing more is meant than that they have that virtue, when they are consistent with the laws established by the legislature. It is observed by Mr. Justice McLean, in delivering the opinion of the court, in the case of U. S. v. McDaniel [supra], that "a practical knowledge of the action of any one of the great departments of the government, must convince any person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law, but it does not follow that he must show a statutory provision for everything he does. No government could be administered on such principles. To attempt to regulate by law the minute movements of every part of the complicated machinery of government, would evince a most unpardonable ignorance on the subject. While the great outline of its movements may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done, that can neither be anticipated nor defined, and which are essential to the proper action of the government. Hence, of necessity, usages have been established, in every department of the government, which have become a kind of common law, and regulate the rights and duties of those who act within their respective limits, and no change of those usages can have a retrospective effect, but must be limited to the future." U. S. v. McDaniel, 7 Pet. [32 U. S.] 14.

These remarks apply with as much force, at least, to the department of war, as to any other branch of the administration. A moment's reflection will satisfy any one that it is quite impossible that any statute should go into all the detail of regulation required to maintain the police and discipline of the army, and still more so, that it should anticipate and provide for all the exigencies demanded for the prompt and effective action of the military force, amidst the vicissitudes and casualties occurring to an army, engaged in the active duties of a campaign. A great deal must unavoidably be left to the judgment and discretion of the officers in command, and much, also, to the head of the department who has the general superintendence of that service. The great outlines of their powers and duties may be fixed by law, but within these landmarks, there is a wide field of detail and contingencies, which no human sagacity can foresee, and which, of course, cannot be provided for by general laws. These are necessarily left to the judgment and discretion of those who have the immediate superintendence of the service, and although no such or-

der can be valid, when it is repugnant to an act of congress, a great many orders, in matters of detail, may be, and are, issued which are not inconsistent with the general law, although not expressly authorized by it. Such orders, emanating from a superior, and especially from the war department, the subordinate officers are bound to obey. In this way, customs and usages become established which constitute a sort of common law of the service. The same authority which establishes the usage may change it, for customary law is abrogated by the establishment of a contrary custom. But while it remains unchanged, it is binding. And such customs and usages in the military service may be proved by the same kind of evidence as is competent to prove a custom in other cases. But the highest evidence will be the regulations of the army, printed and promulgated by the war department; for these regulations, if I have a correct view of the subject, are nothing more than an authoritative digest of these customs. These usages and customs, the gradual product of time and circumstances, constitute a sort of complement of the statute-law upon the subject; and they may affect the rights and obligations of those who are subject to them in various ways. They may regulate and define their privileges and immunities, the nature of the services which may be required of them, and the kind or amount of extra compensation to which they may be entitled, for the performance of services superadded to the ordinary duties attached to their office. But all this must be consistent with the will of the legislature, expressed in the public laws, and not in opposition to it. Now as to the right of the defendant to an additional compensation, for the performance of extra services beyond those ordinarily attached to his office, the statute law is silent. No other act of congress has been relied upon, except the proviso in the act of 1835, before mentioned; and this case cannot, in my opinion, be brought within the provisions of that act, without the interpolation of words which the legislature have not seen fit to use; and this the court has no authority to do, when the words, as they stand, have a plain and sensible meaning. This would be to make, and not to interpret, the law.

The title of the defendant to a commission on disbursements, then, being neither prohibited nor allowed by any act of the legislature, depends on general principles and the custom and usages of this particular service. By the general principles of the common law, he would be entitled to an extra compensation for this extra service and responsibility. It would be no valid objection to the claim, that by the condition of his engagement he was liable to have extra duties and responsibilities devolved upon him; because it would be presumed, that the compensation agreed upon was fixed in reference solely to such services as were in the direct contemplation of the parties when the

engagement was made, and not with a reference to services which rested only upon remote and uncertain contingencies. But the officers of the army are all liable to be put upon extra services, not falling directly in the line of their ordinary routine of duty, some more and some less onerous, some of greater and some of less responsibility; and these requisitions are so common that they may reasonably be presumed to come within the contemplation of the parties when the engagement is made, not merely as a possible but a probable contingency. A great variety of cases may, therefore, be expected to arise, in some of which it may be reasonable to allow an extra compensation, and in others not. The executive department of the government, which has the immediate direction and superintendence of this branch of the public service, has the best means of judging when such an allowance ought, and when it ought not, to be made. Should the department reject a claim which is authorized by an act of congress, there is no doubt that it ought to be allowed by the court; because no order or requisition, of an executive officer, can annul an act of the legislature, or defeat a right which has become vested under a positive law. Or if the department should disallow a claim which is sanctioned by established usage, such usage having the power of law, an order of the department cannot have a retroactive effect to defeat a right already vested. This appears to me to be the clear doctrine of the cases before referred to. But when a claim is presented, not sanctioned by any act of the legislature, nor confirmed by any well-known or established custom, but standing merely upon the general principles of equity, the decision of an executive department, confirmed by the president, if not absolutely conclusive, deserves to be very gravely considered, before it is overruled by the court. Such is the case with this claim for commissions. It is admitted that it is not directly authorized by any act of congress, and no evidence has been produced of a usage to allow commission in such cases. The claim, therefore, stands upon its own naked and general equity.

Now there is, in the general regulations of the army published in 1835, an article precisely applicable to this case. It is the 56th article, on the 23d page of the printed volume, having for its rubric, "Restrictions as to Extra Allowances," and is in these words: "In all cases where an officer of the army is required, by the direction of the war department, to perform duties or to make disbursements, for which compensation is not specially provided by law, and where the instructions directing such duties to be done or disbursements to be made, make no provision for additional compensation, no allowance therefor will be made to such officer. It will then be considered that, in the opinion of the war department, the services

so required are within the proper sphere of his duty as an officer of the army." The date of the approval of this digest is December 31, 1836, subsequent to the time when this claim, or at least the principal part of it, arose, and could not have the effect of defeating rights already vested. But this article is a mere transcript of a general order, bearing the date of May 18, 1833, and was, therefore, in force during the whole period when this service was performed. This order is confirmed by another of March 14, 1835, which enumerates in detail the cases in which extra compensation had been formerly allowed, and which would be disallowed for the future. Among them are, "Monthly allowance, or percentage, to officers of the line temporarily performing staff duties,—and percentage to officers for disbursing funds not properly appertaining to their department." This order is professedly founded upon a construction of the proviso in the act of 1835, before mentioned, and, therefore, it may be said, that if the court overrules the construction put upon the law by the department, the order founded upon that act, and professedly intending to carry it into effect, ought to be overruled also. But the order of 1833 was anterior to the act, and, therefore, could have no reference to it, and that is equally decisive against the claim set up in this case; nor do I see how it can be overcome but by a direct denial of the authority of the department to establish any such rule, with respect to extra allowances, by general regulations and orders. It appears to me, that it is fairly within the authority of the war department, under the sanction of the president, to establish general rules upon this subject, which, when duly promulgated, will be binding on the rights of the officers. It is not contended that an order of the executive can control an act of the legislature, or deprive a party of a right acquired under the law. But, as has been remarked, the legislation of congress can never go into all the minute detail of regulation, involved in the complicated service of the army. Much must unavoidably be left to the discretion of the high officers, who superintend that branch of the public service; and as these matters of detail are left to the regulation of the department, it seems to me reasonable, when officers are required to perform services which do not fall within the range of their ordinary duties, that it is properly within the discretion of the department to determine what, and whether any, extra compensation should be allowed for such extra service, taking care that the rule be uniform, and applying in the same way to all similar cases. An authority of this kind seems to me to be clearly implied, in the reasoning of the court in the case which have been before mentioned. "The amount of compensation," says Mr. Justice McLean, "in the military service, may depend in some degree upon the regulations of the war department; but such regulations must be uniform, and applicable to all officers under the same circumstances." U. S. v. Ripley, 7 Pet. [32 U. S.] 25. And in still broader terms he says, in the opinion before quoted, "Hence, of necessity, usages have been established in every department of the government, which have become a kind of common law, and regulate the rights and duties of those who act within respective limits; and no change of those usages can have a retrospective effect, but must be limited to the future." [U. S. v. McDaniel] Id. 15. If usage is to govern, in what manner does usage become established? Obviously in no other way than by the practice of the department. Apply the remark to the case now in judgment. A usage of allowing extra pay, for extra services of any particular kind, is established, by its being charged in various instances and allowed and ordered to be paid, by the department. It is obvious, therefore, that no usage can be established but by the concurrence of the department; for no number of charges, however numerous, on the part of the officers, can ever constitute a usage, under which any right can be claimed, unless they have been allowed. It is the allowance which constitutes the usage. The existence of the usage necessarily implies the right of the department to make the allowance; and if it have the right to allow, it must have the right to disallow. The regulation of 1833 was in force when these disbursements were made; and it expressly denies any allowance, for disbursements made by an officer, where none is provided by law, and when the order directing them to be made, makes no provision for an additional compensation. This case falls precisely within the words of the regulation, and on this ground, my opinion is, that the claim for compensation cannot be allowed. The verdict must be made to conform to this opinion. From the gross sum of $4,981.47, are to be deducted the sum of $325, paid for articles impressed and lost in the service of the United States, $5,144.15, paid for articles received into their service by the consent of the owners, and lost, and $300.40, for articles purchased, amounting in the whole to $5,769.55, leaving a balance of $2,711.92.

This case was carried to the circuit court by writ of error, but did not come to a hearing until after the decision in the case. U. S. v. Eliason, 16 Pet. [41 U. S.] 291, made in 1842. It was then affirmed without argument, upon the authority of that decision. [Case unreported.]