### DRYFOOS et al. v. EDWARDS, Collector of Internal Revenue.

### JACOB RUPPERT, Inc., v. CAFFEY, U. S. Atty., et al.

(District Court, S. D. New York. November 14, 1919.)

1. War ⊗═4—Congressional war powers not limited by construction.

The so-called war powers of Congress, whether they be deemed derived from the power to declare war, or from the power to raise and support armies, or as incidental to the general power of the sovereign, are not to be limited narrowly in their execution.

2. Intoxicating liquors ⊗═2½, New, vol. 8A Key-No. Series—Congress, under war power, may establish prohibition.

Under its war powers, Congress may establish national prohibition during war, and continue the same after cessation of active hostilities, and during the demobilization and adjustment period prior to return to peace status.

3. Intoxicating liquors ⊗═132—War-time prohibition after cessation of hostilities.

Contention that the War-Time Prohibition Act provided for in National Prohibition Act, tit. 1, showed its purpose to extend only until demobilization, and that the phrase in the original act, "conclusion of the war;" meant cessation of hostilities is without merit; the National Prohibition Act having been passed over the veto of the President, in which he stated demobilization was complete and that the emergency had passed.

4. Intoxicating liquors ⊗═2½, New, vol. 8A Key-No. Series—Power of Congress to pass War-Time Prohibition Act over veto.

Contention that Congress had no power to prescribe such regulations as the War-Time Prohibition Act without consent of the President, cannot be sustained, for, while the President is the Commander in Chief of the Army, he can enact no rules of general conduct, can levy no troops, and cannot place the country in a posture of war, except as Congress delegates to him such authority.

5. Constitutional law ⊗═295—Intoxicating liquors ⊗═17—Deprivation of property without due process by war-time prohibition.

The War-Time Prohibition Act, together with provisions for its enforcement found in National Prohibition Act, are not invalid on a theory that they infringe the Fifth Amendment, since the enactment of prohibitory statutes, though they may work a loss on those engaged in the liquor trade, does not work a deprivation of property without due process any more than similar legislation by the states.

6. Intoxicating liquors ⊗═2½, New, vol. 8A Key-No. Series—Power of Congress to prohibit nonintoxicating drinks.

Those provisions in National Prohibition Act, tit. 1, designed for the enforcement of the war-time prohibition, which forbid the sale of beer containing more than one-half of 1 per cent. of alcohol, are not invalid, even though beer of a higher percentage be nonintoxicating as claimed by brewers; Congress having the same power to forbid the sale of nonintoxicating drinks in the enforcement of prohibition as the states.

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Intoxicating liquors ⬷⟶13—Adoption of Eighteenth Amendment not affecting war powers of Congress.**

The adoption of the Eighteenth Amendment giving a year period for readjustment before it should go into effect left untrammeled the war power of Congress to continue in force and provide for the enforcement of the War-Time Prohibition Act; the time provision in the amendment not affecting the war powers.

**8. Injunction ⬷⟶137(1)—Temporary injunction restraining enforcement of War-Time Prohibition Act denied.**

A temporary injunction restraining federal officials from enforcing the War-Time Prohibition Act and title 1 of the National Prohibition Act providing for its enforcement will not be issued, because plaintiffs, who unsuccessfully asserted the invalidity of such enactment in the lower court, had effected an appeal to the Supreme Court, since the damage done by injunction, which would involve a violation of the national policy as declared by legislative authority, would be incapable of measurement in money.

In Equity. Bill by Alphons Dryfoos and others against William H. Edwards, Collector of Internal Revenue, together with a bill by Jacob Ruppert, Incorporated, against Francis G. Caffey, United States Attorney, and another. On motion by plaintiff in the first case for temporary injunction to restrain the Collector from interfering with the withdrawal and sale of any distilled spirits, and on motion in the second case to enjoin the District Attorney and his codefendant from enforcing against plaintiff the penalties of National Prohibition Act, tit. 1. Injunctions denied.

Decree affirmed 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. 194; 251 U. S. 264, 40 Sup. Ct. 141, 64 L. Ed. 260.

These cases came up on motions by the plaintiffs for temporary injunctions. In the first case the motion was to enjoin the collector from interfering with the withdrawal and sale for beverage purposes in the United States of certain distilled spirits. In the second the motion was to enjoin the district attorney and the deputy collector from enforcing the penalties against the plaintiffs of title 1 of the National Prohibition Act of October 28, 1919, because of its proposed sale of nonintoxicating beer containing more than one-half of 1 per cent. and not more than 2.75 per cent. of alcohol. The defendants moved in each case to dismiss the bills.

The bills present the question of the constitutionality of the War-Time Prohibition Act (Act Nov. 21, 1918, c. 212, 40 Stat. 1047) and of title 1 of the National Prohibition Act, which establishes a definition of the words, "beer, wine or other intoxicating malt or vinous liquors," as used in the War-Time Prohibition Act, and provides a procedure for the enforcement of the earlier act. In the first case the plaintiffs allege·that they are the owners of 474 packages of distilled spirits. which had been lawfully made before the War-Time Prohibition Act went into effect or had been passed (at least it is conceded that the bill shall be so understood), and which had been entered or deposited for storage in government warehouses and transferred in bond: that the defendant had refused ·to permit the withdrawal of any such distilled spirits and continued to refuse it; that the armistice between the German government and the United States was accepted on November 11, 1918. and that the United States in its various departments has suspended all war-time activity and has demobilized its forces, as appears from official communications of the President; that its army and navy has been reduced to less than its peace quota, and that various other of the interruptions of normal industry and intercourse occasioned by war have terminated; that the only constitutional basis of the War-Time Prohibition Act was under the war

powers of the government, and had ceased to exist, so that the act itself was no longer in force.

The second bill alleges that the plaintiff is the owner of three plots of real estate in the city of New York, to the value of nearly $2,000,000, on which is erected a brewing plant, with all its equipment, to the value of over $10,000,000; that it has been engaged in the manufacture of malt liquors since 1910 to an annual amount of more than $8,000,000; that since January 1, 1918, it has discontinued the manufacture and sale of beer of more than 2.75 per cent. alcohol, which does not intoxicate; that it had on hand on October 28, 1918, a large number of barrels of beer containing 2.75 per cent. of alcohol, on which day Congress passed title 1 of the National Prohibition Act, making its sale thereafter illegal; that for some six months before October 28, 1919, no general emergency had existed warranting such prohibition by Congress either military or otherwise; that the armistice had been accepted by Germany and Austria on November 11, 1918, and that the President had proclaimed that prohibition was no longer necessary on October 27, 1919, in a message in which he vetoed the National Prohibition Act; that in this message he had proclaimed that the army and navy had been demobilized and the other objects of the War-Time Prohibition Act had been satisfied; that this was in fact the case, and that most of the boards of governmental instrumentalities appointed to carry on the war had been disbanded; that the effect of title 1 was to destroy the valuable business and good will of the plaintiff, to dissipate its staff of employés, and to reduce its plant to a junk or salvage value only; that the act is unconstitutional, and that the defendants, in enforcing the same, will be acting without warrant of law.

The plaintiff in the second case submitted certain affidavits supporting in detail the allegations of the bill, showing that the reduction of the beer on hand from 2.75 per cent. to one-half of 1 per cent. of alcohol will involve the loss of a large sum of money, also showing that the use of 2.75 per cent. beer was not intoxicating. The whole point in issue is the constitutionality of the two acts; the first as affecting the plaintiffs in the first suit and the second as affecting the plaintiff in the second suit.

Walter C. Noyes, M. J. Stroock, and Arthur L. Strasser, all of New York City, for plaintiffs Dryfoos and others.

Elihu Root and William D. Guthrie, both of New York City, and William L. Marbury, of Baltimore, Md., for plaintiff Jacob Ruppert, Inc.

William I. Frierson, of Chattanooga, Tenn., and Francis G. Caffey and Earl B. Barnes, both of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] The War-Time Prohibition Act was passed on November 21, 1918, 10 days after the acceptance of the terms imposed by the Allies upon the German government and when the Empire had fallen. The circumstances were then such as made patent to every one that successful hostilities could not be resumed, and, as the President declared to Congress a few weeks later, the war had come to an end. If, therefore, the war powers of Congress were dependent upon the prosecution of further hostilities in the field, they had ceased. However, no one urges that this was the case. Every one agrees that to some extent, at least, Congress had the power to take steps necessary to insure the observance of the terms of the armistice and to demobilize the forces which had been called to the colors. The second admission is, however, significant to this extent, that it concedes that the powers of Congress do not terminate at once with the cessation of

hostilities, but that they include the power to restore, in certain respects anyway, the status quo ante bellum. It therefore becomes necessary to inquire how far the powers of Congress go to that end.

It seems to me rather a barren question whether the so-called war powers are to be drawn from the express power "to declare war," though that has been said at times (Miller v. United States, 11 Wall. 268, 305, 20 L. Ed. 135; Ex parte Milligan, 4 Wall. 2, 139, 18 L. Ed. 281, per Chase, C. J.), or whether it is to be found in the added power "to raise and support armies," or whether it is to be inferred from the fact that the United States is the only sovereign recognized among the world of nations, within the territory of the United States, at once responsible and vested with any of the powers which are customarily exercised by such a sovereign so charged (Julliard v. Greenman, 110 U. S. 421, 447, 449, 450, 4 Sup. Ct. 122, 28 L. Ed. 204). The real question is of the limits, after the cessation of hostilities, of the powers of Congress to unravel the results which war has caused. That it has some such powers, as I have said, cannot be denied. The forces must be demobilized, the unnecessary accumulation of supplies must be sold, the railroads must be returned, or some other valid status given them, the ships, built and building, must be disposed of, contracts must be canceled, and the immense organization of workmen and of factories and machinery must be restored to the general industrial life of the nation. So much, at least, is within the powers of Congress, and in the execution of its powers it is not limited narrowly. Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482; The Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287.

Now, I cannot see why it should be thought a legitimate concern of Congress to deliver its soldiers and workmen to the places whence they came, and yet be held totally beyond its ken to inquire into the conditions which they must meet upon their arrival. The nation is to-day the employer of thousands of men upon the railways, which it holds, not by virtue of the interstate commerce clause, but under its war powers. It has discharged some 4,000,000 soldiers and immense numbers of workmen from industries suddenly discontinued by the war. The inevitable industrial adjustments, which so enormous and sudden an influx into the industries of the country involve, are a direct and immediate result of the war. They are one of the consequences of a return to a peace footing, quite as inextricably involved in the prosecution of war as the disposal of its accumulated supplies and munitions. As to the last, Congress might prescribe rules as to how they should be marketed, perhaps, indeed, might even regulate their prices till the effect of the new supply was absorbed. Is not the same rule to apply to its men? The responsibility for some adequate provision against the immediate results of military and industrial demobilization is national, because it was the nation for its own purposes that chose to produce them. No doubt the states might in a measure deal with them, but the nation has neither the duty nor the right to abandon the problems that it alone has raised. It was for war that these men were taken from their work; it was for war that unaccustomed duties were imposed upon them; and it may prove of vital im-

portance in another war whether the nation disregards all further duty to them as soon as they are discharged.

Now a policy of prohibition rests, or at any rate may rest, upon the belief that the use of intoxicating drink will provoke discontent, disorder, economic waste, and industrial friction and maladjustment among this class and during this period. With the correctness of that belief, of course, I have nothing to do; it is enough that it has been long and very widely held. If so, the only question, as I view it, is whether such prohibition has any genuine relation to this object, though hostilities be over, demobilization completed, and the production of military supplies and munitions have ceased. Prohibition may not be the measure of our national responsibility; but it is obviously a step which honest men may believe to look to its discharge. Nor can it be said that the means were more extended than the occasion required, for it is apparent that it may not be practical to prohibit the sale of intoxicants to demobilized soldiers, workmen, and to railway employés without including the community at large. They permeate every corner of the land, and mingle freely and indistinguishably with all citizens. Constituting no longer an ascertainable class, they cannot be kept from access to intoxicants, unless the prohibition be general. Whether the result is worth the sacrifice, whether it was in fact the reason for the decision of Congress, whether it was necessary to include all kinds of intoxicants, even the milder beverages, may indeed be open to doubt; but those are matters which the court may not consider.

I need not inquire whether Congress could extend such a law beyond the declaration of peace. Apparently it was thought that its war powers so extended in Stewart v. Kahn, 11 Wall. 493, 20 L. Ed. 176, in a case quite dissimilar on the facts. In any event, I do not, of course, suggest that under such a guise Congress might indefinitely legislate for the country at large. But most constitutional problems in the end resolve themselves into the question, How far? and there is no royal road to their solution by rhetorically conjuring up outrageous possibilities which may arise from their unflinching application. All I need do here is to say that until the declaration of peace Congress has power to deal with a matter directly arising from the prosecution of war, and so I hold.

[3] But it is said that the statute itself shows that its purpose was to extend only until demobilization, and that it must fail when that purpose is accomplished. Ignoring the rule that preambles are not in any case controlling (Price v. Forrest, 173 U. S. 410, 427, 19 Sup. Ct. 434, 43 L. Ed. 749; United States v. Webster, 28 Fed. Cas. 509, No. 16,658), the recent action of Congress shows that, whatever its original purpose, it now means to continue the measure, regardless of the purposes of the preamble. Title 1 of the National Prohibition Act was passed over the veto of the President, in which he said that demobilization was complete and that the other original purposes of the act were fulfilled. It would be preposterous to suppose that Congress repassed the act, because it disagreed with that statement. The only possible explanation is that it had other purposes in mind, as indeed

the plaintiffs stoutly assert. But title 1 was avowedly ancillary to the War-Time Prohibition Act and designed to make it effective. It assumes the existence of that act, and if the latter had indeed come to an end, because its purpose had been accomplished, the second statute would, I think, have revived it, if Congress had power to do so. And even if title 1 of the later act be not such a revival, the language of the earlier is too explicit to admit of the necessary interpretation from its preamble. Judged merely by its language, it meant to impose prohibition for a period not yet completed, and if that period went beyond the declared purposes, it was not on that account invalid, provided it could depend upon other powers which Congress actually had, but did not expressly invoke. No statute need recite all the grounds which may be urged for its validity.

Again, it is earnestly insisted that, as used in the act, the phrase "conclusion of the war" meant cessation of hostilities. I do not regard that question as material. Even if it were true, the statute by its terms was not to end until the President proclaimed demobilization. That he certainly has not done. He may be right or wrong in his understanding of the law, but it has nothing to do with the fact that he has not yet done that which Congress meant him to do to bring the statute to an end, and until he does it endures.

I am content to accept for argument's sake the rule, suggested by the plaintiffs, that the validity of a statute must depend upon the state of facts at the moment when it impinges upon the individual. Following the intimations obiter in Perrin v. United States, 232 U. S. 478, 486, 34 Sup. Ct. 387, 58 L. Ed. 691, and Johnson v. Gearlds, 234 U. S. 422, 447, 34 Sup. Ct. 794, 58 L. Ed. 1386, I agree that the War-Time Prohibition Act may have been valid in July (Hoffman v. Mc-Elligott, 259 Fed. 525, 170 C. C. A. 487), and in August (Scatena v. Caffey [D. C.] 260 Fed. 750), and yet be invalid in November. But the question now is whether, on the later day, notwithstanding the completion of its original purposes, it was invalid, because Congress had no power to pass it. I have already given the reasons which lead me to an opposite conclusion.

[4] However, the plaintiffs say, granted that Congress might have had an independent power to pass the act if the President had concurred, as between Congress and the President, I must accept the decision of the latter, since upon him is laid the whole responsibility for the conduct of war. As I understand this argument, it involves the premise that, while Congress may declare war, and presumably may place in the President's hand the means for its successful prosecution, he alone may determine when the occasion has arisen for their use, and that, speaking concretely, since he has said that there is no further occasion for war-time prohibition, Congress had no independent power to continue it in operation. Such a doctrine has no support in authority, and the practice in war has not tended to give it support. Nor does it appear to have any basis in principle. The President is, it is true, the Commander in Chief of the armed forces of the United States, and their ordering and disposition rests with him, as does that of all the supplies and munitions which Congress may provide. Yet

provision for a state of war is not vested in the President. He can enact no rules of general conduct; he can levy no troops, cannot supply them, or take any steps to put the country in a posture of war, except as Congress agrees to delegate such powers to him. Nor is it, I think, the practice of any democratic country that the executive should have such powers. It would be an anomalous situation if he might terminate rules which Congress had prescribed, but which he could not initiate. That he might decline to use his powers is true enough, but the plaintiffs here need more than that; they must assert that he alone may absolve citizens from a rule laid down by Congress, because in his judgment it is no longer necessary. I cannot help thinking that this is exactly parallel with a dispensing power.

[5] Finally, it is urged that, even though the war powers extend so far, they are still subject to constitutional limitations, among them to the Fifth Amendment. Ex parte Milligan, supra. That position would be entirely answered by Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, even were the prohibition permanent. The language in the Fifth Amendment must mean what it does in the Fourteenth, and that is not a wrongful taking of property at the hands of Congress, which is not at those of a state. But this prohibition is not permanent, since it will end when peace is declared. That the plaintiffs in the first case will lose their whisky by mere delay cannot be. The plaintiff in the second case will indeed be unable meanwhile to make anything but one-half of 1 per cent. beer, which it says it cannot sell, and that is a genuine financial injury; but it does not result in the taking of its brewery, though the time be reckoned in months. As to its existing beer, it may be de-alcoholized at once, even though at a loss, or, for all that appears, it may keep under refrigeration till peace is declared.

The real sting of the law arises from the incidence of the Eighteenth Amendment on January 16, 1920; for it may, indeed, come true that there will be no interval during which existing stocks of liquors may be sold. Yet I cannot say that it is the War-Time Prohibition Act which produces that result. Its validity must depend upon its effect, and its effect is only to stop the sale of intoxicants for a time. If the Eighteenth Amendment meanwhile gives a coup de grace to the industry, the death lies at its door. That is at least a complete answer to the plaintiff's claim in the second case that its brewery will be destroyed. If it be thought too formal and unreal an answer as to the existing stocks of liquor or of beer, since the days for sale may be altogether taken away, I can only answer that it does not yet appear that there will be none such, or how many they will be. No one can say when peace will be declared; in the case of Germany it would surely be wrong to dispose of the case upon the theory that there would be no reasonable interval. In the case of Austria, whatever the probabilities, they are not such as allow of any certain determination. It may, indeed, be that in the end the plaintiffs will never be able to dispose of their stocks in the United States. Whatever justice there be in compensating them for their loss, it is not such that courts will make it a condition upon the validity of the law.

[6] I hold, therefore, that the War-Time Prohibition Act still remains a valid exercise of Congressional power, and the only question left is of title 1 of the National Prohibition Act, in so far as it includes what on this record I must accept to be nonintoxicating beer. As to that I can say little more than that the power to include it falls squarely within the rule of Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184, and the earlier case of Silz v. Hesterberg, 211 U. S. 31, 29 Sup. Ct. 10, 53 L. Ed. 75. Though the sole justification of the War-Time Prohibition Act be to prohibit the sale of intoxicants, it may be impossible effectively to accomplish that end without including all kinds of beer. The same rule must apply to Congress as to a state Legislature.

[7] Judge Brown in the case of Narragansett Brewing Co. v. Baker & O'Shaunessy (D. C.), decided November 12, 1919 (not for publication), has held that the year granted by the Eighteenth Amendment positively accords that period during which no prohibition legislation can be enacted. It would follow of course that, had active hostilities continued through the year 1919, Congress would have been unable to prevent any sale of intoxicants at all. I should suppose that consistently the argument must apply to sales in the neighborhood of cantonments, though that would perhaps have been too strong a position to assert. With deference, it appears to me that the Eighteenth Amendment, in giving a year's grace, did not intrude upon the existing powers of Congress, whatever they were, any more than it intruded upon the powers of the states to regulate traffic in intoxicants domestically. The year was free, so far as the amendment itself prohibited the business; but it left Congress in untrammeled possession of its power to wage war.

[8] Finally, the plaintiff in the second case says that, even though I conclude, as I do, that the laws are constitutional, it should have a temporary injunction pending appeal. The Supreme Court is to hear argument upon the constitutionality of the War-Time Prohibition Act on Thursday next, and it is reasonable to suppose that an early decision will be reached. The damage done by an injunction meanwhile cannot be measured in money, as in the case of Cotting v. Kansas City Stockyards (C. C.) 82 Fed. 857. Here is a question of national public policy, of allowing the sale of what the constituted authorities apparently regard as injurious to the public, or to so much of it as they have the right to consider. To annul their will, if only for a season, is to do an injury which is, to say the least, as irreparable, if the laws be valid, as to prevent the plaintiffs from selling intoxicants for the same period, if they are not. In all the books we are told that to declare a statute unconstitutional we must be assured beyond question that it is such. A temporary stay now is a declaration for a time that it is unconstitutional; it is to dispense with the statute till the case be finally decided. Assuming that I may do so, there seems to be no proper reason for exercising the power.

The motions for preliminary injunction will be denied, and the bills dismissed.

I am advised that Judge Knox now has pending before him 'a demurrer to an information filed against Thomas F. O'Brien and Patrick McEnery under the War-Time Prohibition Act and the National Prohibition Act, in which demurrer the validity of said acts, upon constitutional grounds, is attacked. I am authorized by Judge Knox to say that he agrees with the conclusions which I have reached, and overrules the demurrer for that reason.