## UNITED STATES v. BENJAMIN et al.

### No. 218.

Circuit Court of Appeals, Second Circuit.

June 9, 1941.

Bertram L. Roberts, of New York City, for defendant-appellant.

John T. Cahill, U. S. Atty., of New York City (Mathias F. Correa, Robert L. Werner, and Raymond Ickes, Asst. U.S. Atty., all of New York City, of counsel), for plaintiff-appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by the defendant, Leon Benjamin, from a judgment convicting him of conspiring with his brother, Jacob Benjamin, and Julius L. Holmes to extort money and other valuable things from one Charles V. Bob, contrary to the provision of U.S.C.A., Title 18, § 250, by threats of informing that Bob had been guilty of bribing Holmes in order to influence the decision of the latter as a petit juror in favor of Bob in violation of U.S.C.A., Title 18, § 241. Jacob Benjamin and Julius L. Holmes pleaded guilty and the latter turned states evidence so that Leon Benjamin was tried alone and hence is the only defendant who appeals. We think that the judgment should be affirmed.

### Plea in Abatement.

■ The appellant filed a plea in abatement in which he alleged that he had been subpoenaed to appear before a grand jury investigating the subject matter of the above indictment. He alleged that he thereupon appeared and asserted his constitutional immunity against being compelled to testify, but notwithstanding this was examined and compelled to give testimony. Upon the trial of the plea it was shown that when he came before the grand jury he was told that he was at liberty to assert his privilege in respect to any answers to questions which might tend to incriminate him. He thereupon stated that he was going to stand upon his constitutional rights. In response to questions relating to his dealings with Bob he answered the questions freely without raising constitutional objections. He was not only a lawyer himself but appears to have been advised by counsel. We have no doubt that his rights were not invaded. It is to be remembered that the appellant had not the constitutional privilege to refuse to testify which belongs to a defendant on trial. He was subject to call as a witness and only had the right of any witness to decline to give answers when interrogated which might tend to incriminate him. O'Connell v. United States, 2 Cir., 40 F.2d 201, 205; Mulloney v. United States, 1 Cir., 79 F.2d 566. As Professor Wigmore has said, the privilege is "an option of refusal and not a prohibition of inquiry". Wigmore Evidence, 2d Ed., § 2268. The appellant is apparently under the erroneous impression that a general statement that he would stand upon his constitutional rights was a substitute for objections to answering specific questions. Moreover, he seems, at least finally to have waived all objections to questions asked him. He had no privilege to refuse to be called as a witness and failed to assert any in respect to the particular questions asked. The plea in abatement was properly overruled.

### The Merits.

■ On the merits the defendant must likewise fail. A few days after the trial of Bob started, which lasted the better part of two months, the appellant, Leon Benjamin, called on him at his office in New York and said that for $50,000 he could arrange so that there would not be a conviction and might even be an acquittal. Bob testified that he rejected the offer and said that he wanted the case determined on its merits. Later, while the trial was still in progress, the defendant Jacob Benjamin introduced himself as a brother of Leon, said that it was he who had requested Leon to make the previous call but that he wanted to call himself and that he would drop the offer of $50,000 down to $15,000. Bob testified that he rejected this offer, as he had the former. Jacob then called again; his offer was again refused, but Jacob replied: "I am going to pay out some money for you. The juror needs the money. I am going to pay it, and we will collect from you because if you don't go ahead with this we will see you are convicted". At the end of November, 1931, the jury disagreed. Jacob took Bob to a hotel, where they met Holmes, whom he recognized as one of the jurors. Holmes and Jacob demanded money and Bob gave Holmes and Jacob $200 or $300 in cash. A few days later Jacob called, said his firm was in difficulties and that he had to have $1,200. Bob had some accountants examine his books, found his story as to financial difficulties apparently true and paid him the $1,200 in cash. Thereafter Jacob called every week or so, made threats of disclosure and in September, 1932, got $1,000 more from Bob, and in return gave a note for that amount. Bob also testified that between the termination of his trial and 1935 he paid other moneys to Jacob, always because of threats. During this period he likewise gave Holmes a suit of clothes and small sums of money and said that he gave Jacob and Holmes alto-

gether about $5,000 or $6,000. Bob testified that some time in 1932 the appellant Leon called on him and asked for $10,000 to buy a position in the office of the United States District Attorney. Leon said he knew all about the Holmes matter from Jacob and that Bob would go to jail if he did not give Leon the money. Bob thereupon paid him $2,000. Early in 1933 Leon called on Bob and said he knew some people in Washington through whom he believed he could get the indictment against Bob, which was still pending, withdrawn. During the period from 1931 to 1936 Bob had demands and threats from Leon—oral, written and telegraphic, and paid out further moneys to him. Jacob followed Bob to Texas where the latter was conducting a securities business and, by threats, obtained employment with an oil company of which Bob was apparently the owner, at a salary of $250 per month. Jacob likewise got an automobile and $700, as well as other sums of money out of Bob in 1936 and 1937, which he said he had to divide with Leon. The last interview with the latter, to which Bob testified, was in the early part of 1935 when Jacob was present. Bob said: "it was a discussion generally, the additional money to be paid to them * * * that if a larger sum of money was paid, that would be the end of them and I wouldn't hear from them again. * * * I said I was broke and couldn't be continually harassed from time to time, and didn't pay them any money." Bob also testified that on one occasion when his Texas company was short of money and Jacob's salary had become a burden, he told the latter that he was through with him and would pay him no more money. Jacob replied that Bob owed him a living for life and was going to pay him a living for life and that if Bob "fired him * * * he would find some way of collecting." That was the last talk they had together. Bob further testified that Jacob "on more than one occasion * * * made the statement that if anything happened to him in Texas or if he was hurt in any manner * * * there was a record of the Holmes matter in the safekeeping of his brother and his wife, * * * in a safe in New York City."

It is argued that there was no corroboration of the testimony of Bob who was confessedly an accomplice in bribing the juror, Holmes. But if any were necessary it was given in the testimony of Nathan and Max Horowitz who testified to sending or delivering money to Leon, Jacob and Holmes. Moreover, the Horowitz brothers gave testimony tending to prove the initial offer of Leon to obstruct justice by influencing a juror. It is to be observed that the defendants got no pay from Bob until after the jury had disagreed. It seems to have been the scheme from the beginning to fix the juror and then to rely on the hold afforded by threats of disclosure to extort pay. The conspiracy was amply proved.

The charge against Leon was not barred by the statute of limitations. It is claimed, to be sure, that 1935 was the last date of any dealings between Bob and himself but there was no proof of any act of abandonment of the enterprise in which he had engaged. The extortion by Jacob was going on until July, 1938. He said that he had to divide with Leon and the latter furnished no evidence that he had withdrawn from the conspiracy before the time of Jacob's retirement. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; Local 167, International Brotherhood of Teamsters et al. v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; United States v. Zwillman, 2 Cir., 108 F.2d 802, 803.

Judgment affirmed.