COMMUNIST PARTY OF UNITED
STATES OF AMERICA et al. v.
McGRATH et al.

Civ. A. No. 419-51.

United States District Court
District of Columbia.

Feb. 28, 1951.

Vito Marcantonio and John J. Abt, New York City, and Joseph Forer, Washington, D. C., for plaintiffs.

Newell A. Clapp, Acting Asst. Atty. Gen., George Morris Fay, U. S. Atty., Edward H. Hickey and Marvin C. Taylor, Attorneys, Dept. of Justice, all of Washington, D. C., for defendant, the Attorney General.

Howard C. Wood, New York City, General Counsel, Subversive Activities Control Board, George Gallagher, Frank R. Hunter, Jr., Washington, D. C., for defendant Subversive Activities Control Board.

Before BAZELON, Circuit Judge and LETTS and PINE, District Judges, holding a statutory three judge court.

LETTS and PINE, District Judge.

The preliminary relief sought must be denied since plaintiffs have not exhausted their administrative remedies and for the further reason that the public interest is paramount to any threatened loss or damage to plaintiffs pending final determination of the case. Furthermore, the constitutional questions raised by the plaintiffs can be saved before the Board and determined upon review by the United States Court of Appeals pursuant to the direction of Congress for judicial review of the Board's actions under the controlling statute.

Counsel will submit for settlement findings of fact and conclusions of law and appropriate order denying the issuance of preliminary injunction.

BAZELON, Circuit Judge (concurring in the result).

Pursuant to § 13(a) of the Internal Security Act of 1950, 50 U.S.C.A. § 792(a), the Attorney General petitioned the Subversive Activities Control Board to enter a final order requiring plaintiff, the Communist Party of the United States, to register. The Party appeared before the Board and moved to dismiss on several grounds, including the alleged unconstitutionality of the Board's governing statute.[1] The motion to dismiss was denied, the Board stating that it was not empowered to consider the constitutionality of the statute which had created it. Suit was thereupon brought by the Party and two of its officers in the District Court to enjoin

---

1. A motion to strike was also filed with the Board. Since it was based upon grounds also relied upon to support the motion to dismiss, it need not be described separately.

the operation of §§ 1–17, 22, 23 and 25 of Title I of the Act of Congress, 50 U.S.C.A. § 781 et seq., 8 U.S.C.A. §§ 137 et seq., 156, 705, under which the Board was acting on the ground that (1) the Act is unconstitutional on its face and as applied; (2) no lawfully appointed Board exists. A statutory three judge court was convened,[2] argument was heard and affidavits presented in connection with plaintiffs' motion for a preliminary injunction.

Neither a motion to dismiss nor any other responsive pleading has been filed by defendants. The narrow question before us is whether a preliminary injunction should issue against the defendants pending final disposition of this suit. Before considering that question, it is important to note that only the Communist Party and two of its officers are seeking relief. There are no alleged "Communist-front" organizations here nor are there any individuals who have been denied or are imminently threatened with denial of non-elective federal employment under § 5, defense facility employment under § 5, or passports under § 6.

Issuance of a preliminary injunction is a matter within the sound discretion of the court.[3] That discretion is traditionally exercised upon the basis of a series of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally. A mere listing of the guiding considerations demonstrates their intangible nature, especially when no attempt is made at this stage to decide finally the questions raised.

Turning to the case before us, we have a motion for a preliminary injunction in a suit to enjoin the operation of certain provisions of an act of Congress on the ground that they are unconstitutional. The strong showing of injury ordinarily required of one seeking an injunction, even where private rights alone are involved, is multiplied manifold when an attempt is made to restrain an act of Congress. Issuance of the preliminary injunction would then be "a declaration for a time that [the statute] is unconstitutional". Dryfoos v. Edwards, D.C.S.D.N.Y., 1919, 284 F. 596, 603. Of course, in a proper case, we are empowered to do just that. But in the exercise of our discretion, we should view more strictly a request for a preliminary injunction "which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate." In such a case, "the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834; Virginian Ry. Co. v. System Federation, No. 40, 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789.

The case before us crystallizes a conflict of interests as critical as any which has ever confronted this nation. Plaintiffs would have us view it as an instance of liberty being stifled by arbitrary authority, of the democratic process being undermined by an hysterical attempt of the major parties to suppress working class opposition. The Party describes itself as a purely political organization which is being singled out for discriminatory treatment in the form of requirements that it register, that its members be denied non-elective federal employment, employment in defense facilities, passports, etc.[4] Plaintiffs point also to criminal penalties allegedly

---

2. Pursuant to 28 U.S.C.A. §§ 2282, 2284.

3. See generally Yakus v. United States, 1944, 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834; Rice & Adams Corp. v. Lathrop, 1929, 278 U.S. 509, 514, 49 S.Ct. 220, 73 L.Ed. 480; Wholesale and Warehouse Workers' Union v. Douds, D.C.S.D.N.Y., 1948, 79 F.Supp. 563, 565, affirmed American Communications Ass'n, C. I. O. v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674.

4. See also, for example, § 10 of the Act which places certain restrictions on use of the mails and of radio or television stations by "Communist-action" organizations; § 11, which provides for denial of tax deductions and exemptions to such organizations.

directed against them[5] and conclude that the consequences to the Party have already been serious and will in time be disastrous. It is said that it already has been and will be deprived of members, contributions, the good opinion of the public, freedom of speech and assembly; that these alleged violations of constitutional rights will deprive the nation of those unpopular ideas of today which have, so often in our history, become the majority doctrine of tomorrow.

If there were no more to be said in the matter, plaintiffs' case would seem overwhelming. But much more is involved. Defendants contend that the Act of Congress here sought to be enjoined represents an attempt to balance the interests of liberty with the interest of the nation in combating what was believed to be a clear and present danger to its security. Since it was felt that the label "political party" should not be used as a cloak to shield foreign-controlled groups, conspiratorial in nature and not devoted to constitutional means of change, the problem was how best to remove the cloak and yet leave bona fide participation in the political process unchecked. This Congress sought to meet by a statute which, among other things, requires the registration of "Communist-action" organizations. Such organizations are defined to include only groups controlled from abroad and existing primarily to advance the objectives of the "world Communist movement".[6] Thus, it is argued, Congress sought to leave political parties, as such, unaffected, so long as such parties are committed to change under the Constitution and are not controlled from abroad—

regardless of the economic or political program preached by them.

To assure orderly procedure for testing the status of any organization failing to register, a Board was created to determine the question of applicability of the Act.[7] The Attorney General may petition such Board for an order requiring registration and must present evidence to sustain his charge. The organization may then make its defense before the Board in a hearing quasi judicial in nature and having all the conventional incidents of procedural due process, such as rights to cross-examination, to subpoena witnesses, to counsel, etc. Review of Board orders may be obtained in the United States Courts of Appeals which will uphold such orders only if they are supported by a "preponderance of the evidence." Individuals required to register as a result of a final order against a "Communist-action organization" may be heard before the Attorney General, the Board and the Court of Appeals on the question of membership.[8] It is this congressionally-designated administrative and judicial remedy which plaintiffs would by-pass by their suit. The relief they seek is a declaration by this court, in advance of determination of the question of coverage by the Board, that the statute is unconstitutional, both substantively and procedurally.

As I have indicated, our function at this stage of the proceedings is to attempt to strike a balance of convenience, interests and probabilities rather than to determine any questions finally. This is obviously not a case in which public authority is being used to deny freedoms occupying a pre-

---

5. See, e. g., § 4 of the Act.

6. Section 3(3) of the Act provides as follows:

  "The term 'Communist-action organization' means—

  "(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist

movement referred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title; and

  "(b) any section, branch, fraction, or cell of any organization defined in subparagraph (a) of this paragraph which has not complied with the registration requirements of this title."

7. Sections 13 and 14 provide for the proceedings before the Board.

8. Section 7(g).

ferred position under the Constitution, such as freedom of speech and assembly, in the interest of clean streets or minimizing noise. Here, great public interests are arrayed on both sides of the controversy. Until plaintiffs prove to us that the objective here sought to be met by Congress in its attempt to deal with one of the critical issues of our time was not a permissible one, or that the means adopted were not drawn with sufficient narrowness to meet constitutional standards, or that there is no clear and present danger justifying both end and means, we should not exercise our discretion to grant relief at this preliminary stage.

Under the circumstances of this case, I would be disposed to grant the relief sought at this time only if it seemed clear that (1) the statutorily prescribed administrative procedure and judicial review were unconstitutional on their face; or (2) failure to restrain continued operation of the Act would result in immediate imposition of penalties provided therein without any intervening proceedings of either a quasi judicial or a judicial nature; or (3) by the very nature of the proceedings in question, deprivation of constitutional rights would inevitably result from their mere continuation. I have not yet been satisfied on any of these counts.

With regard to the administrative remedy, it is argued that § 2 of the Act predetermines the status of the Party as a "Communist-action organization", and therefore there is really no remedy for them to exhaust. Section 2 embodies certain legislative findings and statements of objectives similar to those found in many statutes enacted in recent years. It is to a limited extent incorporated by reference into § 3(a) of the Act which defines "Communist action organizations," *inter alia,* as organizations operating "primarily to advance the objectives of such world Communist movement as referred to in section 2 * * *" and controlled by the foreign government or organization "controlling the world Communist movement referred to in section 2 * * *." In the Board's view, nothing in the legislative findings of § 2 withdraws from it the power to determine whether or not any respondent, including plaintiff Party, falls within the definition of the Act. Nothing requires it to find that any particular organization is either controlled by or primarily advancing the objectives of the "world Communist movement" referred to in § 2. At this preliminary stage, I can see nothing in the structure of the Act which pre-determines the question of coverage. The point is sufficiently doubtful to prevent me from basing an award of a preliminary injunction upon it.

Plaintiffs point to the many serious penalties established by the Act—both the traditionally criminal ones and those denying employment, passports, unrestricted use of the mails, radio and television. None of them can be imposed until after hearing before the Board and opportunity for judicial review in the case of the non-criminal penalties or until after prosecution in the regular course in the case of the traditional criminal penalties. As a result, intervention of a court of equity at this time would seem premature and not within the line of authority typified by Shields v. Utah & Idaho Central R. R. Co., 1938, 305 U.S. 177, 183, 59 S.Ct. 160, 83 L.Ed. 111, and Gibbs v. Buck, 1939, 307 U.S. 66, 77–78, 59 S.Ct. 725, 83 L.Ed. 1111,—cases where criminal prosecutions based upon allegedly illegal or unconstitutional action were imminent. It seems to me that the damage alleged by plaintiffs to have already resulted is attributable to the enactment of the statute and the nature of public opinion which generated it. Such consequences are, of course, serious but they are outside our power to control. At any rate, so far as pertinent, I believe they are more than balanced at this stage by the importance of the public interest here.

The Party also contends that its defense before the Board requires (1) the filing of an answer by plaintiff officers and (2) the testimony of such officers and others; that, in view of existing criminal provisions, both in this Act and in others, such individuals will not appear for fear of self-incrimination or, if subpoenaed, will invoke their privilege and, as a result, the Party's defense will necessarily fail. This conclu-

sion is based in part upon the contention that, under Board procedure, allegations of the petition will stand admitted unless specifically denied or explained by the answer, and such admission will result in entry of an order requiring the Party to register. Since entry of the order may inflict penalties upon the officers and members, it is argued that, realistically viewed, such individuals will be compelled to answer and to testify on behalf of the organization in order to avert the penalties. Their choice is thus said to be between surrendering their privilege—with the possibility of self-incrimination flowing therefrom—and either invoking it or not appearing at all, thereby depriving the Party of necessary defenses in the registration proceeding and incurring possible exposure to individual penalties as a result. These effects are said to constitute such "compulsion to answer" as was condemned in Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 525, 29 L.Ed. 746, as violative of the Fifth Amendment.

The Boyd case involved a customs statute which provided for the forfeiture of merchandise if entry was made "by means of any fraudulent or false invoice" or other false statements written or oral. The statute also declared that upon motion of the Government, the defendant was required to produce in court his private books, invoices or papers "or else the allegations of the [Government] attorney to be taken as confessed". The judgment of forfeiture resulting from the "confession" inferred from the failure to produce in response to the motion was held by the court to be a penalty for invoking the privilege and hence was unconstitutional compulsion of testimony.

In the case before us, a registration order may be issued against the Party by the Board under § 13(d) (2) "without the introduction of any evidence" *only* if the organization "declines or fails to appear at a hearing accorded". This is merely a traditional default procedure. It does not require that a respondent produce evidence demanded by a petitioner, lest the petitioner's allegations be taken as confessed upon failure to comply, as was true in Boyd. The procedure before the Board is such that no allegation of the Attorney General's petition is admitted if the respondent appears and files an answer unless (1) the answer admits the particular allegation, or (2) there is a failure to deny or to explain or to state that respondent is without knowledge of such facts.[9] Thus, the Board's rules of practice are apparently designed to produce an issue, in accordance with recognized rules of pleading. They do not provide for a compulsory production of evidence as in Boyd. In fact, there has not yet been any indication that if the individual officers or members were to rely on their privilege against self-incrimination as a basis for failure to make "denial" of certain allegations in the answer, it would not constitute sufficient "explanation" to avoid admission of such allegations. Although neither the statute nor regulations deal specifically with such a contingency, it may be that the Board would consider itself bound to require proof by the Attorney General of the particular allegations thus left unchallenged in order to make findings based upon a "preponderance of the evidence" as a whole. I do not intend to intimate that the Board is required to adopt such a construction. I say merely that the problem has not yet been considered by the Board and may ultimately be treated by it in such fashion as would render academic much that is argued here.

The necessary import of plaintiffs' position is that, even if they were to file an

---

9. Section 201.7 of the Board's Rules of Practice provides, in pertinent part, as follows: "The answer shall contain a short and simple statement of the facts which constitute the grounds of defense. The answer shall specifically admit, deny or explain each of the facts alleged in the petition or process requiring an answer, unless the organization or individual is without knowledge of such facts, in which case this shall be stated, and such statement shall operate as a denial. All allegations in the petition or process requiring an answer, if no answer is filed or any allegation thereof is not specifically denied or explained by the answer, shall be deemed admitted to be true and may be so found by the Board."

answer, they could not successfully conduct their defense in the registration proceeding. They base this assertion upon their belief that they will be unable to produce witnesses essential to the defense because the testimony of such persons might be self-incriminating. This argument is also premature. A witness' privilege against self-incrimination must be claimed personally, at the time the alleged incriminating questions are propounded, not before they are asked at all.[10] And it is violated only if a witness is *compelled* to answer particular questions under penalty or by legal process. The privilege is "an option of refusal and not a prohibition of inquiry".[11] No witness has yet been compelled to answer anything; no one has claimed the privilege with regard to any particular question. It may be that, ultimately, the Party's witnesses may refuse to appear for fear of self-incrimination or, if they do appear, will invoke their privilege as to particular questions; that their doing so may (1) deprive the Party of defenses it might otherwise have made; (2) give rise to certain inferences in the minds of those composing the tribunal. With regard to (1), it seems clear to me that that is a conscious choice which a witness must make. If a person sued civilly as a joint tort-feasor does not take the stand in his own defense, or if he does take the stand and, when asked about what occurred, invokes his privilege for fear that the information may be used to incriminate him in a criminal prosecution for the same offense, he may be surrendering possible defenses in the civil suit. He also may deprive any codefendants of their defenses against civil liability if certain matters are peculiarly within his knowledge. That is a price he and those joined with him must inevitably pay for his exercise of his constitutional privilege not to answer.. With regard to (2)—possible inferences drawn by the Board from a refusal to answer—I have no

idea at this stage whether or not the Board will draw any. It will be time enough for appropriate judicial intervention when there is a particular situation in which the privilege has been invoked and the nature of the inference drawn is apparent.

It would, of course, be improper to decide at this time the extent to which the Board must permit invocation of the privilege against self-incrimination by those who do appear and testify. I observe merely that the privilege could not constitutionally be denied unless complete immunity from prosecution were granted,[12] except so far as officers of the Party are concerned. Under United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, such officers could not successfully rely upon the privilege as a basis for refusing to produce records and documents of the unincorporated association of which they are officers, even if such materials tended to incriminate them as individuals. But even on this point, there is room for interpretation by the Board. The limits of the White doctrine appear still to be uncharted with regard to the type of oral testimony of officers which may be compelled. See United States v. Daisart Sportswear, 2 Cir., 1948, 169 F.2d 856, 861–862, rev'd on other grounds in Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264. I say at present only that there is nothing in the Act or in the Board's procedure which will necessarily lead to a violation of constitutionally protected rights. I see no valid basis for assuming that the Board would not extend the protection of the privilege when called upon under proper circumstances. On the contrary, I think it unlikely that the Board would seek to compel testimony within the scope of the privilege, in light of the recent decision of the Supreme Court in Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223, and the availability of the privilege in administrative proceedings

10. See Rogers v. United States, 71 S.Ct. 438, and cases cited therein. See also United States v. White, 1944, 322 U.S. 694, 698–699, 64 S.Ct. 1248, 88 L.Ed. 1542; Friedman v. United States, 2 Cir., 1921, 276 F. 792, 794–795; United States

v. Miller, D.C.E.D.Pa., 1948, 80 F.Supp. 979, 981–982.

11. Wigmore, quoted in United States v. Benjamin, 2 Cir., 1941, 120 F.2d 521, 522.

12. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

generally. See 8 Wigmore, Evidence 326, 516 et seq. (1940). Since plaintiffs have not shown that there has been or necessarily threatens to be the sort of testimonial compulsion contemplated by the constitutional grant of the privilege against self-incrimination, I see no constitutional objection on this ground to plaintiffs' going before the Board.

A number of other grounds for declaring the statute unconstitutional are advanced by plaintiffs. Among them is the charge that this Act, as applied to them, is an *ex post facto law;* that it is a bill of attainder which condemns them to punishment without judicial trial; that it is vague and indefinite; that it violates the First and Fifth Amendments generally; that the Board does not lawfully exist. In view of what I have already said, I think further consideration of these points should be withheld at this preliminary stage of the proceedings.

It would appear that my brethren have finally determined that plaintiffs have not exhausted their administrative remedies. I would not decide that question until there has been joinder of issue by responsive pleadings. To do otherwise in a case alleging deprivation of fundamental rights is to ignore the Supreme Court's admonition in Aircraft & Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 774, 67 S.Ct. 1493, 1504, 91 L.Ed. 1796, that the necessity for exhaustion of administrative remedy is subject to the condition that "following the prescribed remedy * * * will not certainly or probably result in the loss or destruction of substantive rights."