**C. TENNANT, SONS & CO., OF NEW YORK, Plaintiff,**

v.

**Robert W. DILL, Collector of Customs, Port of New York, United States Bureau of Customs, Treasury Department, Defendant.**

United States District Court
S. D. New York.
Dec. 16, 1957.

Eugene R. Pickrell, New York City, for plaintiff. Charles G. Pillon, New York City, of counsel.

Paul W. Williams, U. S. Atty., for the Southern District of New York, New York City, for defendant. John S. Clark, Asst. U. S. Atty., New York City, of counsel.

LEVET, District Judge.

The plaintiff, an importer of Paraguayan tung oil, seeks a preliminary injunction restraining and enjoining the defendant from refusing to permit the entry into the United States of certain tung oil owned by plaintiff.

The complaint seeks a declaratory judgment and a mandatory injunction. The plaintiff is a New York corporation; the defendant Dill is the Collector of Customs of the United States Bureau of

Customs, Treasury Department, for Customs Collection District No. 10, encompassing the Port of New York.

On September 2, 1957, there was shipped to the plaintiff from Asuncion, Paraguay, approximately 662,540 pounds of tung oil of a market value of approximately $150,000. On September 12, 1957, another shipment of tung oil of approximately 485,012 pounds was en route to plaintiff on the "Dalmacia," an Argentine vessel.

On September 9, 1957, pursuant to the provisions of Section 22 of the Agricultural Adjustment Act (Title 7 U.S.C.A. § 624), a Proclamation of the President was signed, (No. 3200, 22 F.R. 7265) U.S.Code Cong. & Adm.News 1957, p. 860 imposing a quota on the importation of Paraguayan tung oil of not more than 96,452 pounds prior to October 1, 1957, and of not more than 131,556 pounds during each of the four months commencing October 1957, and ending January 1958, and in no event in the aggregate of more than 2,964,000 pounds during the period commencing September 9, 1957 and ending October 31, 1958. The Proclamation provides that "the total quantity of tung oil entered shall not exceed 26,000,000 pounds" for the period commencing September 9, 1957 and ending October 31, 1958. However, no reference is made to tung oil en route to the United States on September 9, 1957.

On October 7, 1957, the plaintiff attempted to obtain entry of its first shipment of Paraguayan tung oil, but the defendant refused, and still refuses, to permit the entry of all of said tung oil, although permitting the entry of approximately 131,460 pounds of plaintiff's said oil, being the entire quota for the month of October 1957. The balance was refused, except for the purpose of having it consigned to and placed in bond in Bonded Storage Tank No. 16, care of Harbor Tank Storage Co., Guttenberg, New Jersey. The second shipment of approximately 485,012 pounds, having a market value of approximately $100,000, arrived on or about October 30, 1957,

and received a similar rejection. The plaintiff seeks to secure immediate entry of all of this Paraguayan tung oil.

On April 9, 1947, an International Trade Agreement between the United States and the Republic of Paraguay became effective (61 Stat., Part 3, p. 2688 et seq.). Article I, subdivision 1, of this Agreement (p. 2689–90) provides:

"The United States of America and the Republic of Paraguay will grant each other unconditional and unrestricted most-favored-nation treatment in all matters concerning customs duties and subsidiary charges of every kind and in the method of levying such duties and charges, and, further, in all matters concerning the rules, formalities and charges imposed in connection with the clearing of goods through the customs, and with respect to all laws or regulations affecting the sale, taxation, distribution or use of imported goods within the country."

Article I, subdivision 2, of this Agreement (p. 2690) provides:

"Accordingly, articles the growth, produce or manufacture of either country imported into the other shall in no case be subject, in regard to the matters referred to above, to any duties, taxes or charges other or higher, or to any rules or formalities other or more burdensome, than those to which the like articles the growth, produce or manufacture of any third country are or may hereafter be subject."

Article III, subdivision 1, of this Agreement (p. 2691) provides:

"No prohibition or restriction of any kind shall be imposed by the Government of the United States of America or the Government of the Republic of Paraguay on the importation, sale, distribution or use of any article the growth, produce or manufacture of the other country, or on the exportation of any article destined for the territory of the other country, unless the importa-

tion, sale, distribution or use of the like article the growth, produce or manufacture of all third countries, or the exportation of the like article to all third countries, respectively, is similarly prohibited or restricted."

Article XII of this Agreement (61 Stat., Part 3, p. 2700) provides:

"1. If, as a result of unforeseen developments and of the concession granted on any article enumerated and described in the Schedules annexed to this Agreement, such article is being imported in such increased quantities and under such conditions as to cause or threaten serious injury to domestic producers of like or similar articles, the Government of either country shall be free to withdraw the concession, in whole or in part, or to modify it to the extent and for such time as may be necessary to prevent such injury. Accordingly, if the President of the United States of America finds as a fact that imports of any article enumerated and described in Schedule II are entering the United States of America under the circumstances specified in the preceding sentence, he shall determine whether the withdrawal, in whole or in part, of the concession with regard to the article, or any modification of the concession, by the imposition of quantitative regulations or otherwise, is necessary to prevent such injury, and he shall, if he finds that the public interest will be served thereby, proclaim such finding and determination, and on and after the effective date specified in such proclamation, and so long as such proclamation remains in effect, imports of the article into the United States of America shall be subject to the customs treatment so determined to be necessary to prevent such injury. Similarly, if the Government of the Republic of Paraguay finds as a fact that any article enumerated and described in Schedule I is being imported into the Republic of Paraguay under the circumstances specified, it may, if it finds that the public interest will be served thereby, withdraw in whole or in part the concession with regard to the article, or modify the concession by the imposition of quantitative regulations or otherwise, to the extent and for such time as may be necessary to prevent such injury.

"2. Before the Government of either country shall withdraw or modify a concession pursuant to the provisions of paragraph 1 of this Article, it shall give notice in writing to the Government of the other country as far in advance as may be practicable and shall afford such other Government an opportunity to consult with it in respect of the proposed action; and if agreement with respect thereto is not reached the Government which proposes to take such action shall, nevertheless, be free to do so and the other Government shall be free within thirty days after such action is taken to terminate this Agreement in whole or in part on thirty days' written notice."

This Agreement was entered into by the President pursuant to authority contained in Title 19 U.S.C.A. § 1351, commonly known as the International Trade Agreement Extension Act.

On October 30, 1947, a number of nations, including the United States, entered into a General Agreement on Tariffs and Trade, commonly known as GATT (61 Stat., Part 5, pp. A3, A7 et seq.). Article XIII, subd. 3(b) of this Agreement (p. A42) is as follows:

"In the case of import restrictions involving the fixing of quotas, the contracting party applying the restrictions shall give public notice of the total quantity or value of the product or products which will be permitted to be imported during a specified future period and of any change in such quantity or value. Any supplies of the product in question which were en route at the time

at which public notice was given shall not be excluded from entry; *Provided* that they may be counted so far as practicable, against the quantity permitted to be imported in the period in question, and also, where necessary, against the quantities permitted to be imported in the next following period or periods; and *Provided* further that if any contracting party customarily exempts from such restrictions products entered for consumption or withdrawn from warehouse for consumption during a period of thirty days after the day of such public notice, such practice shall be considered full compliance with this sub-paragraph."

Paraguay was not a signatory to GATT (see table following 19 U.S.C.A. § 1351). Nevertheless, the plaintiff contends that by reason of the "most-favored-nation" clause contained in Article I of the Paraguayan Trade Agreement, Paraguay is a beneficiary of the en route clause in GATT and that, therefore, the quota restriction here at issue does not apply to plaintiff's en route tung oil. This contention, in my opinion, lacks merit. Article I, subdivision 1, of the Trade Agreement with Paraguay in effect requires the signatories to grant each other unconditional and unrestricted "most-favored-nation" treatment in all matters concerning:

1. Customs duties and subsidiary charges of every kind;

2. The method of levying such duties and charges;

3. The rules, formalities and charges imposed in connection with clearing goods through customs;

4. All laws or regulations affecting the sale, taxation, distribution or use of imported goods within the country. Subdivision 2 of Article I in substance requires that each of the signatories be accorded treatment equal to that accorded any third country with respect to "duties, taxes or charges" or "any rules or formalities."

The subjects covered by subdivisions 1 and 2 of Article I are described with clarity and particularity. The phrase "import restriction" and the word "quota" nowhere appear. Furthermore, these subdivisions do not, in my opinion, contain language from which their applicability to import restrictions involving the fixing of quotas can be implied.

The following excerpt from Judge Campbell's opinion in Dobrin v. Mallory S. S. Co., D.C.E.D.N.Y.1924, 298 F. 349, 351, would appear pertinent:

"I am unable to agree with the plaintiff's contention. The 'most favored nation' clause, article 5 of the Convention (31 Stat.1940), relied on by the plaintiff herein, reads as follows:

" 'In all that concerns the right of disposing of every kind of property, real or personal, citizens or subjects of each of the high contracting parties shall in the dominions of the other enjoy the rights which are or may be accorded to the citizens or subjects of the most favored nation.'

"In Maiorano v. Baltimore & O. R. Co., 216 Pa. 402, 65 A. 1077, 21 L.R.A.,N.S., 271, 116 Am.St.Rep. 778, the court says in construing a treaty:

" 'The general rule obtains that the court is to be guided by the intention of the parties, and if the words clearly express the meaning and intention no other means of interpretation can be employed.'

"It is therefore clear that the 'most favored nation' clause in that treaty is limited to all that confers the right of disposing of every kind of property real and personal and does not refer to any right to recover for the death of a relative." (298 F. 351)

It is interesting to note that Article I of the Trade Agreement with Paraguay is considerably more explicit and restrictive than are certain other parts of the Trade Agreement. For example, Article III, subdivision 1 of the Agreement em-

ploys the language "no prohibition or restriction of any kind" and in Article XII, subdivision 1 the all-inclusive terms "concession" and "customs treatment" are used.

It seems clear, therefore, that the "most-favored-nation" clause contained in the Trade Agreement with Paraguay is not sufficiently broad to entitle Paraguay, and, hence, the plaintiff, to the benefits of the en route provision of GATT.

■ The Presidential Proclamation of September 9, 1957, while it does not expressly mention en route goods, nevertheless, declares "That for the period commencing September 9, 1957, and ending October 31, 1958, *the total quantity of tung oil entered* shall not exceed 26,-000,000 pounds." (Emphasis supplied.) Since no exception was made as to en route tung oil, the presumption is that none was intended. See Cella Commission Co. v. Bohlinger, 8 Cir., 1906, 147 F. 419, 425, 8 L.R.A.,N.S., 537; United States v. Alamogordo Lumber Co., 8 Cir., 1912, 202 F. 700, 706; Lynch v. Alworth-Stephens Co., 8 Cir., 1923, 294 F. 190, 194, affirmed 1925, 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660. This is particularly true in the case at bar where a contrary interpretation would seriously impair the effectiveness of the Proclamation by flooding the American market with large quantities of imported tung oil.

■ Since the Proclamation by its terms purports to apply to all foreign producers of tung oil, there has been no evident violation of Article III, subdivision 1 of the Trade Agreement with Paraguay, and none can be implied. Furthermore, Article XII, the so-called "escape clause" of the Paraguayan Agreement, would seem to afford the President sufficient right to withdraw concessions to Paraguayan products at any time when the interests of the American economy may dictate. In this Agreement there is no provision exempting goods en route on the date when quota restrictions go into effect.

■ The Presidential Proclamation of September 9, 1957 was issued pursuant to Section 22 of the Agricultural Adjustment Act, 7 U.S.C.A. § 624. This section authorizes the President to limit imports which render or tend to render ineffective or materially interfere with any program or operation under the Act. Section 22(f) as amended in 1951 expressly provides that:

"No trade agreement or other international agreement heretofore or hereafter entered into by the United States shall be applied in a manner inconsistent with the requirements of this section."

The Agricultural Adjustment Act, as thus amended, would in any event take precedence over the International Trade Agreements upon which plaintiff relies, even if, as plaintiff contends, these Agreements are in essence treaties. As was stated by Mr. Justice Field in Whitney v. Robertson, 1887, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386:

" * * * By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other, * * * ."

See also Chae Chan Ping v. United States, 1888, 130 U.S. 581, 600, 9 S.Ct. 623, 32 L.Ed. 1068.

As to the equitable basis of the preliminary relief herein sought, the plaintiff points out that it has expended substantial sums in the purchase of this Paraguayan tung oil; that it has been unable to import the greater part of it into the United States; that it has been compelled to store the same in tanks at Guttenberg, New Jersey, at continuing

expense; that the market is declining in a seasonal cycle at least, and that it thus suffers irreparable damage.

The purpose of the Agricultural Adjustment Act, Title 7 U.S.C.A. § 601 et seq., obviously is to aid the economy of the domestic producers. The fact that the plaintiff may suffer incidental hardship by reason of its inability to import and market Paraguayan tung oil ad libitum is one of the unfortunate incidents which may flow from the governmental control of imports. However, it is not necessarily an injury on which either action or equitable relief may be predicated.

The defendant points out:

1. That before the Presidential Proclamation public notice was given of impending quota arrangements. On March 27, 1957, the United States Tariff Commission issued public notice that an investigation had been instituted under Section 22 of the Agricultural Adjustment Act, Title 7 U.S.C.A. § 624, for the purpose of determining whether tung oil or tung nuts were being imported or were likely to be imported in such quantity as to impair the farm price program supervised by the Department of Agriculture;

2. Public hearings were scheduled in the Tariff Commission Building in Washington, D. C. on May 2, 1957, and the published notice indicated that interested parties would be given an opportunity to be heard in accordance with the provisions of Section 201.10 of Title 19, Code of Federal Regulations:

3. Public notices were posted in the offices of the Tariff Commission in Washington, D. C. and in New York; they were printed in the Federal Register on March 28, 1957.

4. Copies of said notice were sent to importers known to have an interest in the matter; and the official records of the Tariff Commission reveal that since May 1954 the plaintiff was on the Tariff Commission's mailing list to receive copies of such public notices with respect to tung oil.

To this forewarning the plaintiff makes no denial, but in substance says that it could not cease operations while the Executive Branch deliberated over a quota. It, therefore, appears that plaintiff had an opportunity to exercise caution but failed to do so.

However, even assuming that plaintiff has made such a showing of irreparable injury as would otherwise entitle it to a preliminary injunction on equitable grounds, it does not appear that an adequate statutory basis for such relief is here present. The clear and convincing right which would seem to be necessary to warrant a grant of a mandatory injunction, which under the circumstances here involved would in effect be a determination of the entire action in favor of the plaintiff, appears to be lacking.

The quota restriction imposed by the Presidential Proclamation in aid of the farm price support program would in itself be adversely affected by the admission of plaintiff's Paraguayan tung oil. Balancing the respective interests here involved, the need for temporary or preliminary relief by the individual, under the circumstances of this case, would not seem to justify interference with the governmental program.

As was stated by Swan, Circuit Judge, in Wholesale and Warehouse Workers Union, Local 65 v. Douds, D.C., 79 F. Supp. 563, affirmed American Communication Ass'n, C.I.O. v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925:

"* * * But even if exclusion of Local 65 from the ballot is an adequate showing of irreparable injury, we all agree that competing equities of greater weight justify refusal of an interlocutory injunction. It is well established that when the right to an injunction is doubtful and the granting of a temporary injunction pending decision would work irreparable injury to a congressionally declared public policy, a court of equity will deny such relief. Dryfoos v. Edwards, D.C. S.D.N.Y., 284 F. 596, 603; Yakus v. United States, 321 U.S. 414, 441,

442, 64 S.Ct. 660, 88 L.Ed. 834." (79 F.Supp. at page 565)

The motion for preliminary injunction or mandatory injunction is, therefore, denied.

So ordered.